[No. 28756-4-III.   Division Three.   October 27, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. YASIN AHMED IBRAHIM, *Appellant*.

504

*Lee Edmond* (of *Edmond Law PLLC*), for appellant.

*James P. Hagarty*, *Prosecuting Attorney*, and *David B. Trefry*, *Deputy*, for respondent.

¶1 SWEENEY, J. — This appeal follows the conviction of a legal alien for violating a former statute that required aliens to register all firearms. Citizens are not required to

register their firearms. The defendant here was a permanent legal alien when he was arrested for possession of a firearm. We conclude that the statute violates the defendant's right to equal protection of laws and we therefore reverse the conviction and dismiss the prosecution.

## FACTS

¶2 Yasin Ahmed Ibrahim and David A. Soto sat in a car behind an abandoned motel in Yakima about 8:00 a.m. on April 22, 2009. Yakima City Police Officer Craig Miller pulled into the motel lot and saw both men walk from the car. The car was registered in Seattle. Officer Miller looked inside the car and saw that the ignition assembly had been broken apart and he saw a screwdriver on the floorboard of the car. Mr. Ibrahim and Mr. Soto were by this time walking north up First Avenue. Officer Miller got into his car and caught up with the men. He then got out and asked if they had a moment to speak with him. They said sure. Mr. Soto had thrown something to the ground as Officer Miller approached. The two men did not cooperate with Officer Miller. They were very nervous. They continued to put their hands in their pockets and turn away from the officer despite his requests that they keep their hands where he could see them and not turn away. Both men continued to move into the officer's space, again despite his repeated requests that they step back. Officer Miller called for backup.

¶3 Two backup officers arrived. Officer Miller directed one to search the area where Mr. Soto had thrown something to the ground. That officer found a pipe used to smoke dope. Officer Miller arrested Mr. Soto, searched him incident to that arrest, and found other drug paraphernalia. Officer Miller directed the second backup officer to search Mr. Ibrahim. He did so based on Mr. Ibrahim's conduct during the earlier investigation of the status of the car both men had been in. The officer found a .22 caliber revolver in

Mr. Ibrahim's pocket. Mr. Ibrahim was booked into jail on a charge of alien in possession of a firearm and the State later charged him by information with that crime.

¶4 Mr. Ibrahim is not a citizen of the United States, but he is a lawful permanent resident. Mr. Ibrahim moved to suppress both his statements to police and the pistol seized by police. He argued that the circumstances here did not justify the frisk. The court disagreed and refused to suppress either the pistol or Mr. Ibrahim's statements to police about where he got the pistol. The court concluded that the officers had sufficient concerns for their safety to justify the frisk.

¶5 Mr. Ibrahim also moved to dismiss, arguing that the statute under which he was charged was unconstitutional on several grounds. Essentially, he argued that the statute denied him equal protection of law (as a legal alien) and, in particular, his Second Amendment right to possess a firearm. The court disagreed, concluded that the statute did none of this, and denied Mr. Ibrahim's motion. The statute was repealed in 2009. Former RCW 9.41.170, *repealed by* LAWS OF 2009, ch. 216, § 8, effective July 26, 2009.

¶6 The State submitted a witness list in anticipation of trial. The judge looked at it and noticed that no one from Immigration and Customs Enforcement (ICE) had been listed and wondered on the record how the State would prove that Mr. Ibrahim was an alien. The State then amended its witness list to include a witness from ICE. Mr. Ibrahim moved to dismiss pursuant to CrR 8.3 and argued that the trial judge had improperly injected himself into the adversarial process by pointing out the State's oversight and that the State's amended witness list was too late. The court concluded there was no prejudice and denied the motion.

¶7 The court then, based on stipulated facts, convicted Mr. Ibrahim of being an alien in possession of a firearm. And the court sentenced him to 126 days with credit for the 126 days he had already served in the county jail.

## DISCUSSION

### AUTHORITY TO DETAIN AND FRISK

¶8 Mr. Ibrahim contends that the officer did not have grounds to frisk him because there was no reasonable basis to conclude that he might be armed and dangerous. Mr. Ibrahim characterizes his conduct as cooperative, even if a bit nervous. And he urges that this is not enough to justify the search. He also notes that the whole affair took place on a busy street in broad daylight with other police officers on the scene, which also should have militated against the necessary findings that he was armed and dangerous.

¶9 The material facts here are largely undisputed, indeed, stipulated to. So the only remaining question on this issue is whether the court's conclusion that the officers' stop and later frisk of Mr. Ibrahim was justified by the circumstances here. *State v. Santacruz*, 132 Wn. App. 615, 618, 133 P.3d 484 (2006). That is a question of law that we will review de novo. *State v. Rankin*, 151 Wn.2d 689, 694, 92 P.3d 202 (2004).

¶10 Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution prohibit warrantless searches and seizures as per se unreasonable. *State v. Garcia-Salgado*, 170 Wn.2d 176, 184, 240 P.3d 153 (2010). There are exceptions, however, including the so-called *Terry*[1] stop. *State v. Day*, 161 Wn.2d 889, 895, 168 P.3d 1265 (2007). The stop is authorized if police have a reasonable suspicion of criminal activity. *Id*. But a frisk for weapons requires something more. *Id*. The officer must have a reasonable concern for his own safety to justify the frisk. *Id*. And the search must go no farther than that necessary to assure the safety of the officer. *Id*. So the elements the State must show to support a *Terry* frisk are that (1) the initial stop is legitimate, (2) a

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

reasonable safety concern exists to justify a protective frisk for weapons, and (3) the scope of the frisk was limited to the protective purpose. *Id.*

¶11 The initial stop here was prompted by a Seattle-licensed car parked behind an abandoned motel with two occupants who started walking away as the officer drove into the parking lot. The ignition in the Seattle car had been destroyed and there was a screwdriver on the floor. It was reasonable for the officer to suspect that the car may have been stolen. One of the occupants discarded a drug pipe as the officer approached the two of them. The occupants later denied that they had been in the car. Mr. Ibrahim's primary objection, however, appears to rest on the second prong of the test for a *Terry* frisk. He argues that the officer did not have the necessary reasonable concern that Mr. Ibrahim was armed and presently dangerous. Br. of Appellant at 24.

¶12 And while *Terry* uses the words armed and presently dangerous, the actual measure appears to be more modest; absolute certainty is not required. *Terry*, 392 U.S. at 21-24. Our Supreme Court has suggested that courts should be reluctant to substitute their judgment for that of the officer on the scene. *State v. Collins*, 121 Wn.2d 168, 173-74, 847 P.2d 919 (1993). " ' "A founded suspicion is all that is necessary, some basis from which the court can determine that the [frisk] was not arbitrary or harassing." ' " *Collins*, 121 Wn.2d at 173-74 (emphasis omitted) (alteration in original) (quoting *State v. Belieu*, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989) (quoting *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966))); *State v. Miller*, 91 Wn. App. 181, 185-86, 955 P.2d 810, 961 P.2d 973 (1998).

¶13 To the facts justifying the initial *Terry* stop, the record adds the following findings: both men were looking around, both continued to place their hands in their pockets or out of the officer's sight despite his requests that they keep their hands visible, both men continued to turn sideways away from the officer, and both men continued to

come into the officer's space, again, despite his repeated requests that they step away from him.

¶14 Mr. Ibrahim characterizes his conduct as simple nervousness. Br. of Appellant at 26. We conclude that his conduct showed more than simple nervousness and therefore supports the officer's pat down, especially given the appropriate deference to the officer on the street trying to protect himself. *Collins*, 121 Wn.2d at 173-74.

RIGHT OF A LEGAL ALIEN TO POSSESS A FIREARM

¶15 Mr. Ibrahim contends that as a lawful permanent resident alien, he was entitled to the same constitutional rights as citizens of this country. This includes the right to keep and bear arms guaranteed by the Second Amendment to the United States Constitution and article I, section 24 of the Washington State Constitution. He argues that former RCW 9.41.170 illegally discriminates against legal aliens by requiring registration of a firearm solely because he is an alien.

¶16 Whether or not this statute violates the state or federal constitutions is a question of law that we will review de novo. *State v. Chavez*, 163 Wn.2d 262, 267, 180 P.3d 1250 (2008) (citing *State v. Eckblad*, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004)); *State v. Sieyes*, 168 Wn.2d 276, 281, 225 P.3d 995 (2010).

UNCONSTITUTIONAL BEYOND A REASONABLE DOUBT

¶17 The State cites passages from *State v. Hernandez-Mercado*[2] that hold it is Mr. Ibrahim's burden to prove beyond a reasonable doubt that a statute is unconstitutional. Br. of Resp't at 4. Washington case law has consistently applied this standard. *Island County v. State*, 135 Wn.2d 141, 146-47, 955 P.2d 377 (1998). But the beyond-a-reasonable-doubt standard is a burden of *persuasion* imposed on the State to convict someone of a crime; that is, the

[2] 124 Wn.2d 368, 879 P.2d 283 (1994).

State must prove to the satisfaction of some trier of fact that the evidence it produced proves a given proposition beyond a reasonable doubt. *State v. Deal*, 128 Wn.2d 693, 698, 911 P.2d 996 (1996). It is the level to which a trier of fact must be persuaded. *Sch. Dists.' Alliance for Adequate Funding of Special Educ. v. State*, 170 Wn.2d 599, 620, 244 P.3d 1 (2010) (Sanders, J., dissenting). And what we are doing here or, at least, what we should be doing is deciding whether former RCW 9.41.170 passes constitutional muster. And again, that is a question of law that we review de novo with the presumption that the statute is constitutional. *City of Seattle v. Ludvigsen*, 162 Wn.2d 660, 668, 174 P.3d 43 (2007). It seems to us, then, this is not a question that lends itself to evaluation by an evidentiary standard used to evaluate just how persuasive evidence must be to find someone guilty.[3] Even so, it does not make a difference to our analysis here.

---

[3] "Reasonable doubt" as a legal criteria for evaluating the constitutional propriety of legislation seems to first appear in *Smith v. City of Seattle*, 25 Wash. 300, 307-08, 65 P. 612 (1901). There the court stated, " 'Legislators, as well as judges, are bound to obey and support the constitution, and it is to be understood that they have weighed the constitutional validity of every act they pass. Hence the presumption is always in favor of the constitutionality of a statute; every reasonable doubt must be resolved in favor of the statute, not against it; and the courts will not adjudge it invalid unless its violation of the constitution is, in their judgment, clear, complete, and unmistakable.' " 25 Wash. at 308 (quoting HENRY CAMPBELL BLACK, HANDBOOK ON THE CONSTRUCTION AND INTERPRETATION OF THE LAWS 93 (1896)). *Smith* relies on two cases; neither of which uses the words "beyond a reasonable doubt." *Sawyer v. Dooley*, 21 Nev. 390, 32 P. 437 (1893); *Wadsworth v. Union Pac. Ry.*, 18 Colo. 600, 33 P. 515 (1893). In the mid- to late-nineteenth century, several early legal scholars endorsed the idea that to declare a statute unconstitutional, the court must believe "beyond a reasonable doubt" that the statute is, indeed, unconstitutional. THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 182-86 (1868); HENRY CAMPBELL BLACK, HANDBOOK ON THE CONSTRUCTION AND INTERPRETATION OF THE LAWS 110-18 (2d ed. 1911); JAMES BRADLEY THAYER, THE ORIGIN AND SCOPE OF THE AMERICAN DOCTRINE OF CONSTITUTIONAL LAW 18-26 (1893). The idea was to emphasize the importance of deference to democratically elected legislatures as a co-equal branch of the government. But this burden of persuasion standard of beyond a reasonable doubt has more recently been appropriately described as archaic. Professor Noah Feldman refers to the nineteenth century treatises endorsing the standard of review as "archaic." NOAH FELDMAN, SCORPIONS: THE BATTLES AND TRIUMPHS OF FDR'S GREAT SUPREME COURT JUSTICES 147 (2010) (discussing Justice Hugo Black). And he reflected that when a green United States Supreme Court Justice used the standard in his first dissent, the usage was

Reasonable Restrictions on Possession of Firearms

¶18 The State argues generally that restrictions on the possession and use of firearms is a proper exercise of governmental authority. Br. of Resp't at 8-9. And while that is true and Mr. Ibrahim does not argue otherwise, that argument and the line of cases[4] the State cites are not helpful. That is because these cases all address restrictions on felons or illegal aliens, or restrictions on carrying a loaded assault weapon down the street in a threatening manner. The State argues from these cases that "[t]he regulation of guns possessed by non-citizens is no different." Br. of Resp't at 11.

¶19 The analysis here turns on the constitutional validity of the restriction imposed by former RCW 9.41.170 and, specifically, whether restrictions imposed by this former statute on a legal alien's possession of a firearm amount to a reasonable restriction. So cases cited by the state upholding restrictions on *illegal* aliens or felons or cases upholding restrictions on the type of firearms people can possess are not helpful. Mr. Ibrahim is not an illegal alien nor did he possess any of the types of weapons specifically prohibited nor was he in a place where everyone was prohibited from possessing a firearm.

¶20 Mr. Ibrahim then argues that as a legal permanent resident alien, he is entitled to most of the same rights as a citizen including the right to keep and bear arms. And he argues that to deny or restrict that right based on his alien

---

"embarrassing" to appellate lawyers. *Id.*; *see also* Archibald Cox, The Warren Court: Constitutional Decision as an Instrument of Reform 4, 22-23, 106-07 (1968); Archibald Cox, The Role of the Supreme Court in American Government 105 (1976); Gary Lawson, *Thayer Versus Marshall*, 88 Nw. U.L. Rev. 221, 224 (1993).

[4] *State v. Sweeney*, 125 Wn. App. 77, 104 P.3d 46 (2005) (felons); *State v. Krzeszowski*, 106 Wn. App. 638, 24 P.3d 485 (2001) (felons); *State v. Anderson*, 94 Wn. App. 151, 971 P.2d 585 (1999) (felons), *rev'd on other grounds*, 141 Wn.2d 357, 5 P.3d 1247 (2000); *State v. Jeffrey*, 77 Wn. App. 222, 889 P.2d 956 (1995) (prohibiting felons from possession of a firearm); *State v. Spencer*, 75 Wn. App. 118, 876 P.2d 939 (1994) (carrying a loaded semiautomatic AK-47 down the street in a threatening and aggressive manner); *State v. Barnes*, 42 Wn. App. 56, 708 P.2d 414 (1985) (restricting firearms in penal institutions).

status denies him the equal protection of law afforded by the Fourteenth Amendment to the United States Constitution.

¶21 The Fourteenth Amendment "entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971); *Hsieh v. Civil Serv. Comm'n*, 79 Wn.2d 529, 531-32, 488 P.2d 515 (1971). State action violates equal protection rights if it separates individuals into discrete classes based on citizenship and subjects those individuals to disparate treatment. *Graham*, 403 U.S. at 371, 377. A classification based on an individual's status as an alien is "inherently suspect and subject to close judicial scrutiny." *Id.* at 372.

¶22 Here, the State invites us to favorably compare the exercise of "the State's police power" to restrict possession of guns by felons[5] with exercise of that same power to restrict gun ownership by those legally residing in the country and without a criminal conviction. Br. of Resp't at 8-9. The difference is obvious. Those legally in this country are generally,[6] and in this case, entitled to the rights and benefits of citizens. And, of course, felons do not enjoy those same rights.

¶23 The United States Supreme Court has held that rights guaranteed by the United States Constitution extend "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990). That includes those who are legally in the country and excludes those who are illegally in the country. *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292, 24 S. Ct. 719, 48 L. Ed. 979 (1904).

---

[5] See cases set out in note 3.

[6] *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006).

¶24 Mr. Ibrahim falls within that class of people who have developed a sufficient connection with this country to be considered part of that community. He is a legal alien and before now had no convictions. The State argues that the former statute's requirement that any alien "obtain an alien firearm license" eliminates any constitutional infirmity. Former RCW 9.41.170. The problem with the State's argument is that it ignores the absence of any such requirement for a citizen. And again it makes no compelling case based on anything in this record why an alien legally in this country should be treated any differently than a citizen. And more importantly, as we have already concluded, it denies due process of law by discriminating between legal aliens and citizens.

¶25 Ultimately, the State cites to no case that holds that the government, state or federal, may deny aliens legally in this country rights guaranteed by the constitution as fundamental. And that includes the right to bear arms.

¶26 The right to bear arms is a fundamental right guaranteed by the United States Constitution. *Sieyes*, 168 Wn.2d at 287-91. The right to bear arms is guaranteed by the Second Amendment, is fundamental, and applies to this state. *Id.* at 291. Our state constitution by article I, section 24 secures the same right as a mandatory individual right. *Id.* at 293. And while it would seem that given previous constitutional jurisprudence that strict scrutiny should be the measure,[7] both our State and the United States Supreme Courts have declined to specify a level of scrutiny that should guide any judicial discussion of this fundamental right. *Id.* at 295. Both have opted to look instead at the "original meaning, the traditional understanding of the right, and the burden imposed" by the statute. *Id.* at 294-95.

¶27 Our State Supreme Court has strongly suggested that the prohibitions in this statute violate equal protection: "There is nothing in the 'statutory scheme' which

---

[7] *See Sieyes*, 168 Wn.2d at 303-04 (J.M. Johnson, J., dissenting).

establishes that the status of being foreign-born of itself creates 'dangerous hands' in the context of firearms control. . . . RCW 9.41.170 is not necessary to safeguard the State's interest in keeping 'firearms out of dangerous hands.'" *Hernandez-Mercado*, 124 Wn.2d at 377-78.

¶28 The State also invites the court to compare former RCW 9.41.170 to the federal statute (18 U.S.C. § 922), which prohibits illegal aliens from possessing a firearm. Br. of Resp't at 6-7. Again, the distinction is clear. Mr. Ibrahim is not an illegal alien.

¶29 Former RCW 9.41.170 then denied legal aliens the equal protection of law by denying their Second Amendment right to keep and bear arms.

¶30 We reverse the conviction and dismiss the prosecution.

KULIK, C.J., and SIDDOWAY, J., concur.